**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION, YOUNGSTOWN**

FRANK POLICARO, CAROL POLICARO, ROBERT DIFONZO, RONDA DIFONZO, MATTHEW DIFONZO, RYAN MCKENZIE, and DOUG SHEPPARD, individually and on behalf of all other similarly situated,

*Plaintiffs*,

v.

NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY.

*Defendants*.

No. 4:23-cv-495

**CLASS ACTION**
**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiffs Frank Policaro, Carol Policaro, Robert Difonzo, Ronda Difonzo, Matthew Difonzo, Ryan McKenzie, and Doug Sheppard (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned counsel, bring this Class Action Complaint against Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company (together "Norfolk Southern" or "Defendants"). The following allegations are based upon review of public documents and investigation by Plaintiffs' counsel and upon personal knowledge as to Plaintiffs' specific allegations.

**NATURE OF THE ACTION**

1. On Friday, February 3, 2023 at approximately 8:55 p.m., Norfolk Southern freight train 32N ("Train 32N") derailed in East Palestine, Ohio, igniting a chemical fire that would burn for days and spewing known toxic and carcinogenic chemicals into the surrounding environment.

2. Train 32N was heading eastbound with chemicals including vinyl chloride, polyvinyl, polyethylene, butyl acrylates, ethyhexyl acrylate, and ethylene glycol monobutyl ether — all known to be hazardous, combustible, and carcinogenic compounds.

3. Just prior to the derailment, an overheated and failing wheel bearing triggered a mechanical alarm. The malfunction caused 38 cars to derail, and even more were damaged.

4. The derailment caused the release of over a million pounds of dangerous chemicals and plumes of thick black smoke into the surrounding air, water, and soil. Contaminants have now been detected as far as the Ohio River, which provides drinking water to over five million people.

5. Among the chemicals released into the environment following the derailment was vinyl chloride, a contaminant known to cause cancer in humans.

6. Vinyl chloride is a highly combustible gas and, thus, was contained in pressurized train cars.

7. Norfolk Southern allowed the wreckage from the derailment to burn for days. The rising temperatures caused a safety valve in one of the vinyl chloride train cars to fail, creating an imminent risk of explosion. Residents within a one-mile radius were evacuated.

8. In response, Norfolk Southern decided to release the vinyl chloride near the derailment site and light it on fire, creating a chemical burn pit that released even more toxic black smoke into surrounding neighborhoods.

9. Exposure to hazardous chemicals and thick plumes of smoke forced the Plaintiffs and Class members to either abandon their homes and property or shelter in place until the smoke cleared.

10. The spread of toxic pollutants brought life near East Palestine to an abrupt halt, closing local businesses and interfering with Plaintiffs' ability to use and enjoy their properties.

11. The effects of the derailment will be long-lasting. Hazardous and carcinogenic chemicals continue to seep into the soil and groundwater. Some residents have been advised to drink only bottled water.

12. Plaintiffs' exposure to and inhalation of the hazardous and carcinogenic chemicals has caused various physical symptoms, including irritation of the skin, eyes, and throat, coughing, itching, and difficulty breathing. Plaintiffs will incur costs associated with monitoring their symptoms and their increased risk for future medical complications.

13. Plaintiffs' properties and businesses have already suffered and will continue to suffer from significant diminution in value due to the environmental contamination and associated health risks, as well as the proximity to the derailment site and stigma that comes along with being located near an environmental disaster.

14. Plaintiffs have suffered and will continue to suffer decreased property values, damage to real and personal property, lost wages, loss of business income, and loss of business goodwill.

15. Plaintiffs bring this action to recover these and other damages incurred by residential property owners and business-owners in close proximity to the derailment site. Because of the long-term implications of the derailment and subsequent environmental disaster, Plaintiffs also seek any injunctive and equitable relief this Court deems just, including the establishment of a program and creation of a fund to cover the medical monitoring required to screen, prevent, and treat injuries caused by the derailment.

## PARTIES

### A. Plaintiffs

16. Plaintiff Frank Policaro is a resident and citizen of Columbiana County, Ohio. Mr. Policaro owns residential property in East Palestine, Ohio and is a member of the Class defined below.

17. Plaintiff Carol Policaro is a resident and citizen of Columbiana County, Ohio. Ms. Policaro resides in East Palestine, Ohio and is a member of the Class defined below.

18. Plaintiff Robert Difonzo is a resident and citizen of Jefferson County, Ohio. Mr. Difonzo owns residential property in Steubenville, Ohio and is a member of the Class defined below.

19. Plaintiff Ronda Difonzo is a resident and citizen of Jefferson County, Ohio. Ms. Difonzo owns residential property in Steubenville, Ohio and is a member of the Class defined below.

20. Plaintiff Matthew Difonzo is a resident and citizen of Jefferson County, Ohio. Mr. Difonzo resides in residential property in Steubenville, Ohio and is a member of the Class defined below.

21. Plaintiff Ryan McKenzie is a resident and citizen of Westmoreland County, Pennsylvania. Mr. McKenzie operates a fishing expedition business with substantial operations in East Palestine, Ohio and is a member of the Class defined below.

22. Plaintiff Doug Sheppard is a resident and citizen of Columbiana County, Ohio. Mr. Sheppard resides in residential property in Leetonia, Ohio and is a member of the Class defined below.

## B. Defendants

23. Defendant Norfolk Southern Corporation ("NSC") is a corporation organized under the laws of Virginia with its headquarters and principal place of business in Atlanta, Georgia.

24. Defendant Norfolk Southern Railway Company ("NSRC") is a wholly-owned subsidiary of NSC. NSRC is a Class I railroad corporation organized under the laws of Virginia with its headquarters and principal place of business in Atlanta, Georgia.

25. Upon information and belief, NSRC has consistently held itself out as conducting business affairs as a conduit for NSC in connection with the ownership and operation of their railway enterprise. Additionally, NSC and NSRC constitute a joint venture in connection with their railway enterprise insofar as they agreed to undertake ownership and operation of the enterprise jointly for the purpose of sharing associated profits and losses, and in connection therewith, each contributed their respective skills, property or resources in exercising control or right of control over the facilities.

26. Norfolk Southern is one of eight Class I railroads and is one of the largest railway operators in the United States. Norfolk Southern operates 19,420 route miles in 22 different states and serves every major container port in the eastern United States.

## JURISDICTION AND VENUE

27. The Court has jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 Class members; and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

28. This Court has personal jurisdiction over NSC and NSRC because both systematically transact and conduct business in Ohio, including the transportation of hazardous

materials by train, from which they derive substantial revenue. Based on their tortious conduct within Ohio, Defendants expected, or should have expected, that their acts would have consequences within Ohio.

29. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Norfolk Southern's Consistent Disregard for Safety

30. The February 3, 2023 derailment is not the first time Norfolk Southern has neglected safety in favor of revenue—Norfolk Southern has a track record of cutting corners and disregarding safety.

31. Between 2019 and 2022, Norfolk Southern reported 623 derailment incidents to the Federal Railroad Administration. Of these accidents, 78 occurred in Ohio, 77 occurred in Pennsylvania, and 178 involved trains transporting hazardous materials.[1]

32. Norfolk Southern has repeatedly fought against the implementation of reasonable safety measures, including lobbying against stronger federal transportation regulations and blocking a shareholder initiative that would have required it to address risks associated with the transportation of hazardous materials.

33. Instead of addressing growing safety concerns, Norfolk Southern "achieved record performance for train length and weight" and "gross ton-miles per employee," resulting in record high income of $4.45 billion in 2021.[2]

---

[1] Data collected from *Rail Equipment Accident/Incident Data,* U.S. DEPT. OF TRANSP., available at https://data.transportation.gov/Railroads/Rail-Equipment-Accident-Incident-Data/85tf-25kj (last accessed March 10, 2023).

[2] Norfolk Southern, *2022 Notice of the Annual Meeting of Shareholders and Proxy Statement* (2022), at 4, 48, available at http://www.nscorp.com/content/nscorp/en/investor-

34. Even after the derailment, Norfolk Southern continues to endanger its employees and the communities in which it operates. Norfolk Southern had a second train derail in Springfield, Ohio on March 4, 2023, and a third train recently collided with a dump truck in Cleveland, killing the train's conductor.

35. Norfolk Southern's corporate philosophy of prioritizing profits over safety led to the environmental disaster in East Palestine and poses a danger to the millions of people in the 22 states in which it operates.

**B. <u>The Derailment and Ensuing Chemical Spill</u>**

36. On the evening of February 3, 2023, Norfolk Southern Freight Train 32N was travelling eastbound from Madison, Illinois to Conway, Pennsylvania.

37. Train 32N was 141 cars in length and was carrying various hazardous and combustible materials. The staff aboard Train 32N consisted of only five employees— two railworkers, a train engineer, a conductor, and a trainee.

38. Twenty of the cars contained hazardous and combustible chemicals, including, but not limited to:

a. <u>Vinyl chloride</u>: a flammable, colorless gas used for industrial and commercial purposes. It is associated with increased risks of cancer, especially a rare form of liver cancer, brain and lung cancers, lymphoma, and leukemia;

b. <u>Butyl acrylate</u>: a flammable, clear, colorless liquid with a strong, fruity odor that is known to cause difficulty breathing, sensitization dermatitis, and irritations to the eyes, skin, and upper respiratory system;

---

relations/financial-reports/proxy-statements/2022-proxy-statement/_jcr_content/mainpar/download/file.res/nsc_proxy_2022.pdf.

c. Ethylhexyl acrylate: a flammable, clear, colorless liquid used in the production of paints and plastics. Exposure can cause drowsiness, convulsions, and irritation of the eyes and skin;

d. Isobutylene: a flammable, colorless gas used in the production of high octane aviation fuel. Exposure can cause dizziness, drowsiness, unconsciousness, and irritation of the skin and eyes;

e. Ethylene glycol monobutyl ether: a highly flammable, colorless liquid with a mild, pleasant odor used as a solvent in the production of paints and varnish. Exposure can cause headache, nausea, vomiting, and dizziness; and

f. Diethylene glycol: a clear, colorless, and near odorless liquid used to make various industrial products. Exposure can cause gastrointestinal symptoms, renal failure, and neurological issues;

g. Hydrogen sulfide: a colorless gas with a strong odor of rotten eggs used in industrial settings including textile factories. Exposure can cause irritation to the eyes and respiratory system, apnea, coma, convulsions, dizziness, headache, weakness, irritability, insomnia, and upset stomach;

h. Hydrogen cyanide: a colorless or pale-blue liquid or gas with a bitter, almond-like odor used in fumigation, electroplating, mining, and chemical synthesis. It interferes with the human body's use of oxygen and can negatively impact the brain, heart, blood vessels, and lungs; and

i. Benzene: a highly flammable colorless or light-yellow liquid with a sweet odor used in the production of plastics, resins, nylons and synthetic fibers, lubricants, rubbers, dyes, detergents, drugs, and pesticides. Exposure can cause drowsiness,

dizziness, rapid or irregular heartbeat, headache, tremors, confusion, unconsciousness, and death.

39. Despite the extreme danger posed by the chemicals it transported, Norfolk Southern failed to take the appropriate precautions when loading the cargo onto Train 32N. Norfolk Southern loaded 40% of its weight at the rear of the Train, while lighter cars were loaded between the front engine and the back-loaded rear tankers. This disproportionate and improper car alignment created an oscillatory stress on Train 32N's axles.

40. Hot box detectors, instruments that use infrared sensors to measure the temperature of passing train bearings to monitor potential safety issues, are typically installed every ten to twenty miles along a track to monitor train axle temperatures.

41. Norfolk Southern's policy establishes a minimum threshold of 170 degrees above ambient temperature recorded on a hot box detector before a crew is alerted and must stop to inspect an issue.[3]

42. At approximately 8:12 p.m., over forty minutes and 20 miles before the crew was alerted of an issue, a camera in Salem, Ohio captured video footage of Train 32N showing the wheel axle of tank car number twenty-three glowing brightly.

43. A hot box detector placed in Salem, Ohio also recorded the overheated axle on car number twenty-three as Train 32N passed.

44. Train 32N passed at least two subsequent hot box detectors, each registering increasing temperatures, before the crew was alerted to any issue.

[3] https://www.ntsb.gov/investigations/Pages/RRD23MR005.aspx

45. At approximately 8:55 p.m., Train 32N passed a hot box detector in East Palestine, Ohio, which recorded a wheel bearing reading 253 degrees hotter than the outside temperature.

46. A mechanical defect alarm sounded, alerting the crew to a mechanical issue. In response, the crew applied the emergency brake, and 38 of Train 32N's 141 cars derailed in East Palestine.

47. The derailed cars spilled hundreds of thousands of pounds of hazardous and combustible materials, igniting a chemical fire that would burn for days.

48. The massive chemical fire generated thick, black plumes of smoke that covered the surrounding area and emitted toxins into the surrounding air, water, and soil.

### C. Norfolk Southern Burns One Million Pounds of Vinyl Chloride

49. Norfolk Southern did not extinguish the fire, and, as the chemicals continued to blaze, the heat caused the pressure in several cars containing vinyl chloride to spike.

50. One of the pressure valves in a vinyl chloride car began to fail, and, fearing imminent danger of explosion, Ohio officials ordered the immediate evacuation of residents living within a one-mile radius of the derailment site.

51. Rather than containing the chemical fire ignited by the derailment, Norfolk Southern opted to "vent and burn" the vinyl chloride from five pressurized cars to prevent a fatal explosion.

52. When combusted, vinyl chloride creates hydrogen chloride, carbon monoxide, carbon dioxide, and phosgene gas, Phosgene is a highly-toxic compound that was used as a chemical warfare agent in World War I and subsequently banned by the Geneva Convention. Exposure to phosgene gas can cause irritation to the eyes, a dry burning throat, foamy sputum,

difficulty breathing, chest pain, and increased risks for a rare form of liver cancer, brain and lung cancers, lymphoma, and leukemia.

53. In light of the imminent explosion risk as well as risks associated with breathing the fumes from Norfolk Southern's "vent and burn" strategy, Ohio and Pennsylvania officials jointly issued an evacuation order for residents within a one-mile by two-mile area of the derailment site, which included parts of Western Pennsylvania. Officials also recommended that residents living outside of the evacuation zone remain inside their homes and shelter in place.

54. Norfolk Southern punctured holes in the pressurized cars to enable a "controlled release" of the vinyl chloride, drained the vinyl chloride into a pit, and then set the discharged vinyl chloride ablaze.

55. The controlled release and burn of vinyl chloride caused a thick, black plume of smoke to form. The plume was so large that it was visible from a Pittsburgh weather radar.

56. In deciding to vent and burn the vinyl chloride, Norfolk Southern prioritized reopening the tracks over keeping residents safe. Norfolk Southern did not seriously consider alternative strategies because the vent and burn plan allowed the rail line to quickly reopen.

57. Norfolk Southern made the decision to vent and burn the vinyl chloride without properly consulting state and local officials and without fully considering other options that would have kept the rail line closed slightly longer. This kept first responders and state and local leaders in the dark and unable to adequately respond to the accident.

### D. Norfolk Southern's Failure to Contain the Spill and Take Remedial Action

58. In contravention of federal law and regulations, Norfolk Southern did not report the derailment until about 10:53 p.m., approximately two hours after the accident.

59. Throughout its response to the derailment, Norfolk Southern has kept local, state, and federal response teams in the dark. When teams first arrived on site, Norfolk Southern

continued to handle the situation without consulting with the relevant authorities, resulting in confusion and an unorganized response.

60. To make matters worse, Norfolk Southern did not even fully disclose the materials that Train 32N was carrying to the relevant authorities, leaving response teams ill-positioned to control the situation and extinguish the growing chemical fire. Norfolk Southern provided spotty information to authorities regarding its plan to vent and burn the vinyl chloride and even failed to provide accurate information regarding the number of cars containing hazardous chemicals and what those chemicals were. Without complete information, authorities could not reasonably consider alternatives to the vent and burn of vinyl chloride.

61. At this time, Norfolk Southern has still not removed all of the contaminated soil at the derailment site. Norfolk Southern even resisted removing the tracks to excavate the soil under them—which was directly exposed to the toxic chemicals—because doing so required a longer closure of the rail line. Only after pressure from the public and state and federal officials did Norfolk Southern change its plan to include removal of this directly contaminated soil.

62. The air pollution caused by the massive release of toxic chemicals and smoke spans much further than East Palestine. The EPA’s air quality monitor in Youngstown, Ohio, over 20 miles from the derailment site, registered particulate pollution at triple the normal amount of ambient particulate matter on February 6, 2023. Levels of particulate matter continued rising until February 9, 2023, when the amount reached five times higher than normal.

63. The chemical discharge into local waterways also has long-reaching consequences. Water samples from the Ohio River, which provides drinking water for over five million people, and nearby creeks show evidence of contamination from the hazardous chemicals released by Norfolk Southern. The toxic chemicals were also observed running into storm drains.

Residents with well water have been advised to continue drinking bottled water because groundwater has been contaminated.

64. Local wildlife, and especially aquatic life, has been devastated by exposure to the hazardous chemicals. Thousands of fish from over a dozen different species have died in areas surrounding the derailment site, and residents have reported harm to various wildlife and domestic animals including dogs, chickens, and foxes.

65. Residents near East Palestine have fared no better. Individuals have reported numerous physical symptoms since the derailment, including irritation of the skin, eyes, and throat, cough, bloody noses, bronchitis, and trouble breathing. Residents will incur future medical costs related to monitoring these symptoms as well as the increased risks of certain cancers from exposure to the hazardous and carcinogenic chemicals.

66. Cleanup of the derailment site could take years. Many of the chemicals released into the air, water, and soil are not easily biodegradable, meaning the chemicals will continue to pollute the surrounding area for years to come. Significant monitoring will be required to ensure that chemical levels remain in acceptable ranges.

67. Vinyl chloride presents especially troubling long-term environmental concerns. When it contaminates a water supply, it can enter homes through use of water for household purposes, like showering and cooking. Normal weather events, such as rain, also pose substantial risks because a new wave of contaminants may enter the environment.

68. The discharge of over a million pounds of vinyl chloride and hundreds of thousands of pounds of other hazardous chemicals has already harmed countless Ohio and Pennsylvania residents and will continue to pose risks to the environment and public health for years to come.

## PLAINTIFFS' FACTUAL ALLEGATIONS

69. Plaintiffs Frank and Carol Policaro reside together with their two grandsons in a home located less than a mile away from the derailment site. Mr. Policaro is a firefighter who responded to the derailment on February 3, 2023. Their home fell within the evacuation order, and on February 5, 2023, Mrs. Policaro left the home with their two grandsons while Mr. Policaro remained with the fire department on standby, including when Norfolk Southern vented and burned the vinyl chloride. Large plumes of thick, black smoke were clearly visible from their property, and approximately a week after the incident, Mr. Policaro developed physical symptoms including a bad cough, fever, headache, sore throat, and watery eyes. A few days later. Mrs. Policaro developed similar symptoms. Mr. Policaro's symptoms worsened, prompting him to go to the emergency room. Both Mr. and Mrs. Policaro continue to experience mild symptoms, including a cough. Mr. Policaro, who owns the home, has also suffered from its substantial decrease in market value as a result of Norfolk Southern's conduct alleged herein.

70. Plaintiff McKenzie is a resident of Westmoreland County, Pennsylvania. He operates a fishing business where he leads tourists on weekend fishing expeditions. The bulk of his expeditions ventured in and around East Palestine, Ohio. As a result of Norfolk Southern's conduct alleged herein, the wildlife around East Palestine has been devastated, substantially impacting fishing. The stigma associated with the derailment has also led to a severe decline in business. Because of Norfolk Southern's conduct, Mr. McKenzie faces loss of business income and loss of business goodwill.Plaintiffs Robert and Ronda Difonzo, along with their son Matthew Difonzo, reside in Jefferson County, Ohio. Plaintiffs Robert and Ronda Difonzo are married and jointly own their residence in Steubenville, Ohio and have suffered a decrease in the market value of their property as a result of Norfolk Southern's conduct alleged herein. The family reports a funny taste and burning sensation when drinking the tap water and have thus

been unable to drink their tap water without filtering it first. Further, shortly following the derailment, the family's two dogs became ill after drinking the home's tap water. One of the dogs worsened over the span of a few days until ultimately passing away. Both dogs were in good health before the derailment.

71. Plaintiff Doug Sheppard resides in Leetonia, Ohio. Since the derailment, he has experienced new symptoms including headaches, muscle aches, joint pain, numbness and tingling of the tongue, anxiety, and sleeping difficulties.

## CLASS ACTION ALLEGATIONS

72. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring claims on behalf of all similarly situated persons. Plaintiffs seek to represent the following similarly situated individuals (collectively, the "Class"):

> Subclass 1: All individuals who resided in, leased, or owned property any part of which is within approximately a 30-mile radius of the derailment site as of February 3, 2023 ("Residential Class").

> Subclass 2: All individuals and entities who owned and/or operated a business, commercial property, or farmland within a 30-mile radius of the derailment site as of February 3, 2023 ("Business Class").

73. The Class excludes: (a) Defendants and their affiliates, parents, subsidiaries, and employees; (b) claims for personal or bodily injuries; (c) the judges, court staff, and mediators assigned to this case and their immediate families; (d) insurers and insurance syndicates with claims arising out of subrogation for damages regarding the February 3, 2023 derailment and chemical spill; and (e) all persons who make a timely election to be excluded from the Class.

74. Plaintiffs reserve the right to modify and amend the Class definition in connection with their Motion for Class Certification.

75. Ascertainability: Class members can be easily ascertained for purposes of notifying them of this action through standard methods based on their geographic location, property records, and other public records.

76. Numerosity: The Class includes thousands of people, such that it is not practicable to join all Class members in one lawsuit.

77. Commonality: The issues involved in this lawsuit present common questions of fact and law, including:

a. Whether Norfolk Southern breached its duty of care to the Plaintiffs and the Class;

b. Whether Norfolk Southern breached its duties in transporting hazardous chemicals;

c. Whether Norfolk Southern negligently operated Train 32N;

d. Whether Norfolk Southern caused the derailment;

e. Whether Norfolk Southern caused environmental contamination by releasing hazardous chemicals into the surrounding air, water, soil, and property;

f. Whether Norfolk Southern caused property values to diminish within 30-miles of the derailment site;

g. The extent of property damage, loss of business income, and other economic damages caused by the derailment;

h. Whether Norfolk Southern created a public nuisance;

i. Whether Norfolk Southern created a private nuisance;

j. Whether Norfolk Southern created a statutory nuisance;

k. Whether Norfolk Southern caused a trespass to the property of Plaintiffs and the Class;

l. Whether Plaintiffs and the Class are entitled to medical monitoring relating to their exposure to the hazardous chemicals omitted as a result of the derailment;

m. The extent of medical monitoring that will be necessary for Plaintiffs and the Class following their exposure to the hazardous chemicals omitted as a result of the derailment;

n. Whether Norfolk Southern engaged in willful, wanton, or reckless conduct with respect to their actions causing the derailment;

o. The appropriate nature of class-wide equitable relief;

p. The amount of economic damages owed to Plaintiffs and the Class;

q. The appropriate measure of damages or relief to Plaintiffs and the Class; and

r. Whether Norfolk Southern is liable to Plaintiffs and the Class for punitive damages resulting from the derailment and the ensuing environmental disaster.

78. Typicality: Plaintiffs' claims are typical of those of the putative Class members. The claims all arise from the same wrongful conduct by Norfolk Southern, all Plaintiffs and Class members have been economically injured by the same wrongful conduct by Norfolk Southern, and all claims are based on the same legal theories.

79. Adequacy of Representation: Plaintiffs and counsel will fairly and adequately protect the interests of Class members as required by Rule 23(a)(4). Plaintiffs' counsel. Schlichter Bogard & Denton, LLP, has an established track record of success in railroad law, class actions, and toxic torts. Importantly, Plaintiffs' attorneys have decades of experience representing injured railroad workers and are experts in railroad law. Schlichter Bogard &

Denton has argued four cases before the Supreme Court, two of which related to railroad safety. In *Norfolk Southern Railway Co. v. Sorrell*, 549 U.S. 158 (2007), counsel defeated Norfolk Southern's bid to weaken protections for railroad workers under the Federal Employers Liability Act("FELA"). Moreover, Schlichter Bogard & Denton's pioneering work in complex class actions has received national acclaim from numerous publications, including the New York Times and Wall Street Journal, among others. By way of limited example, the federal judiciary has repeatedly praised the extraordinary results achieved by the firm on behalf of its class-action clients:

- "The Court agrees with other district courts that Schlichter, Bogard & Denton are attorneys of the highest caliber." *Marshall v. Northrup Grumman Corp.*, No. 16-6794, 2020 U.S. Dist. LEXIS 177056, at *11 (C.D. Cal. Sep. 18, 2020).

- "This Court is unaware of any comparable achievement of public good by a private lawyer in the face of such obstacles and enormous demand of resources and finance." Order on Attorney's Fees, *Mister v. Illinois Central Gulf R.R.*, No. 81-3006 (S.D. Ill. 1993).

- "Without the unique and unparalleled foresight for this novel area of litigation by Schlichter, Bogard & Denton, the class would not have obtained any recovery." *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 U.S. Dist. LEXIS 14772, at *11 (Jan. 28, 2020).

- "Class Counsel performed substantial work . . . investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the [class]." *Will v. Gen. Dynamics Corp.*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *9 (S.D. Ill. Nov. 22, 2010).

- Courts have "recognized the experience, reputation, and ability" of Plaintiffs' counsel and found that the firm "demonstrated diligence, skill, and determination in this matter and, more generally, in an area of law in which few attorneys and law firms are willing or capable of practicing." *Clark v. Duke Univ.*, No. 16-1044, 2019 U.S. Dist. LEXIS 105696, at *11 (M.D.N.C. June 24, 2019).

- "Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients, . . . has invested . . . massive resources and persevered in the face of . . .enormous risks[.]" *Nolte v. Cigna Corp.*, No. 7-2046, 2013 U.S. Dist. LEXIS 184622, at *8 (C.D. Ill. Oct. 15, 2013).

- "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination*." Beesley v. Int'l Paper Co.*, No. 6-703, 2014 U.S. Dist. LEXIS 12037, at *8 (S.D. Ill. Jan. 31, 2014).

80. Injunctive and Declaratory Relief: The Class can be certified under Rule 23(b)(2) because Plaintiffs and the Class remain at an unreasonable safety risk because of Norfolk Southern's conduct alleged herein, including continued exposure to environmental contamination. Norfolk Southern has acted and failed to act on grounds that are generally applicable to Plaintiffs and the Class and that require court imposition of unform relief to ensure compatible standards of conduct toward Plaintiffs and the Class.

81. Predominance: The common questions of law and fact outlined above predominate over any questions affecting only individual members of the Class.

82. Superiority: A class action is manageable and the appropriate vehicle for fair and efficient adjudication of Plaintiffs' and the Class members' claims because if individual actions were required to be brought by each member of the Class, the result would be a multiplicity of actions, creating a hardship to the Class, the Court, and Defendants.

**COUNT I—NEGLIGENCE**

83. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

84. Under federal and state law, Norfolk Southern had a duty to use reasonable care in transporting hazardous and toxic chemicals, including, but not limited to, the following duties:

a. Regularly inspecting, maintaining, and repairing its railways and railcars to ensure safety;

b. Ensuring property safety procedures, including in the event of a mechanical malfunction;

c. Preventing derailments, including ensuring mechanisms and procedures for stopping railcars without derailment function properly;

d. Preventing environmental contamination, chemical spills, and toxic pollution events;

e. Preventing mechanical malfunction of its railcars and other equipment;

f. Loading railcars according to accepted practice, including avoiding placing heavier cars in the rear and overloading the train with excessive cars;

g. Properly staffing trains and rail cars;

h. Properly hiring, training, instructing, managing, and supervising all employees and agents, including train engineers and dispatch operators;

i. Properly evaluating the qualifications, skills, adequacy, and capabilities of all employees and agents, including train engineers and dispatch operators and including during emergency situations;

j. Properly training all employees and agents, including train engineers and dispatch operators, regarding safety and emergency procedures in the event of a fire and/or a derailment;

k. Taking all steps to safely transport hazardous chemicals so as to not cause harm to residents near the railway, who are foreseeable victims of Norfolk Southern's course of conduct;

l. Ensuring that proper procedures exist and are implemented for identifying and addressing a fire on a railcar;

m. Ensuring that proper procedures exist and are implemented for deploying the emergency brake in the event of a mechanical malfunction and/or fire;

n. Ensuring that proper procedures exist and are implemented in the event of a derailment;

o. Ensuring that proper procedures exist and are implemented for timely notifying governmental authorities of a derailment;

p. Quickly executing an emergency-response plan in the event of a derailment;

q. Timely evacuating high-risk geographic areas to avoid exposing residents to hazardous chemicals and causing serious injury;

r. Quickly, adequately, and accurately warning individuals who have been exposed to hazardous chemicals of the risk of serious injury and illness from exposure to the chemicals.

s. Containing the spread of hazardous chemicals to prevent polluting nearby air, water, soil, and property;

t. Safely disposing of ultra-hazardous materials as well as contaminated soil and water without exposing Plaintiffs to the hazardous chemicals; and

u. Investigating and addressing the causes of Norfolk Southern's high number of derailments and implementing a plan to avoid future derailments.

85. Norfolk Southern breached its duties to Plaintiffs and the Class by, among other things:

a. Failing to inspect, maintain, and repair its railcars and railways to prevent fires and/or derailments;

b. Failing to reasonably pack, transport, maintain, dispose of, and otherwise handle hazardous chemicals, including highly flammable gases and liquids;

c. Failing to ensure that proper safety procedures existed to address mechanical malfunctions;

d. Failing to ensure that proper safety procedures existed to address a fire on a rail car;

e. Failing to implement proper procedures for stopping railcars without causing a derailment;

f. Failing to deploy the emergency brake in the event of a mechanical malfunction of railcar fire in such a manner that prevents derailment;

g. Failing to utilize proper safety and monitoring procedures and alarms to detect the railcar fire and mechanical malfunction;

h. Failing to utilize proper procedures and training for responding to mechanical malfunctions of a railcar;

i. Failing to utilize proper procedures and training to identify and address railcar fires, including fires on trains carrying hazardous chemicals;

j. Failing to load the train consistent with industry-accepted practices by overloading the train and placing heavy cars in the back;

k. Failing to have adequate staff on board to address the railcar fire, mechanical malfunction, and subsequent derailment;

l. Failing to properly hire, train, manage and supervise employees and agents, including train engineers and dispatch operators;

m. Failing to properly evaluate the qualifications, skill, adequacy, and capabilities of employees and agents, including train engineers and dispatch operators;

n. Failing to implement proper procedures and training for responding to a derailment;

o. Failing to institute proper procedures for timely notifying governmental authorities of a derailment;

p. Failing to prevent the release of hazardous chemicals from its railcars;

q. Failing to avoid exposing the environment to hazardous materials following the derailment;

r. Failing to timely implement an emergency response plan after the derailment;

s. Failing to transport ultra-hazardous materials so as to not cause harm to Plaintiffs and the Class, who were foreseeable victims of Norfolk Southern's course of conduct.

t. Failing to properly contain hazardous materials spilled during the derailment;

u. Failing to properly dispose of or eliminate hazardous chemicals from the derailment site, including opting for the vent and burn of vinyl chloride instead of considering other options;

v. Failing to timely evacuate the geographic region adjacent to the derailment site and at a high risk for toxic exposure;

w. Failing to timely provide federal, state, and local authorities with accurate information regarding the derailment and the hazardous materials aboard Train 32N;

x. Failing to accurately advise Plaintiffs and the Class of the risk of serious injury and illness from exposure to the hazardous chemicals;

y. Failing to investigate and address its high number of derailment incidents in the last several years;

86. Norfolk Southern owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, an abnormally dangerous and ultra-hazardous activity.

87. Norfolk Southern owed and breached a duty of reasonable care commensurate with the release and burning of hazardous materials, including the release of vinyl chloride, phosgene, and hydrogen chloride into the air, water, and soils.

88. Because of the serious risks associated with its vinyl chloride vent and burn strategy, Norfolk Southern owed and breached a duty to investigate the risks of air, water, and soil contamination, as well as the increased risks of cancer and other health problems to the public.

89. All economic damages suffered by Plaintiffs and the Class as a result of the derailment described herein were directly and proximately caused by Norfolk Southern's course of conducting its abnormally dangerous activity. Norfolk Southern also failed to take actions required to mitigate the dangers associated with its operations, causing the Plaintiffs and Class to sustain even higher damages.

90. As a direct and proximate result of Norfolk Southern's release of hazardous materials throughout a 30-mile radius surrounding the derailment site, the property of Plaintiffs and the Class was, and is, being physically invaded by Norfolk Southern's toxic discharges.

91. As a direct and proximate result of Norfolk Southern's negligence, Plaintiffs and the Class have suffered, and will continue to suffer, property damages, including but not limited to diminution in value and physical injury to property, which is corroborated by the presence of odors, mists, and droplets on the property, physical manifestations of symptoms reported by

residents, mass casualties of local wildlife, nearby soil and water testing, and meteorological observations and analysis of the toxic plumes created by the derailment.

92. As a direct and proximate result of Norfolk Southern's negligence, many Plaintiffs and Class members were forced to evacuate their properties and relocate to avoid exposure to the hazardous materials.

93. As a direct and proximate result of Norfolk Southern's negligence, Plaintiffs and the Class are unable, and will continue to be unable, to benefit from the quiet use and enjoyment of their own property as well as enjoyment of public property.

94. As a direct and proximate result of Norfolk Southern's negligence, Plaintiffs and the Class were exposed, and continue to be exposed, to high levels of hazardous and carcinogenic chemicals, increasing the likelihood of current respiratory symptoms and long-term cancer risks.

95. Many of the Plaintiffs and the Class Members have already reported physical health symptoms, including eye, skin, and throat irritation, nausea, headaches, vomiting, dizziness, nosebleeds, coughing, bronchitis, and light-headedness. Complete remediation of the environment by Norfolk Southern is necessary to alleviate the health risks posed by their toxic discharges.

96. As a direct and proximate result of Norfolk Southern's negligence, Plaintiffs and the Class have suffered and continue to suffer injury and damages including, but not limited to, property damage, diminution of property value, costs to repair and restore property, and lost property. Plaintiffs and the Class also face increased medical costs in light of their continued exposure to hazardous, carcinogenic chemicals.

97. Plaintiffs and the Class suffer and will continue to suffer decreased property values, damage to their real and personal property, lost wages, loss of business income, loss of business good will, and increased risks of serious illness.

98. Norfolk Southern acted maliciously and recklessly, with aggravated or egregious fraud, and/or intentional disregard for the rights of Plaintiffs and the Class so as to warrant the imposition of punitive damages.

## COUNT II—STRICT LIABILITY

99. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

100. Norfolk Southern was the owner and operator of Train 32N at all times relevant to this action.

101. Norfolk Southern had supervision, custody, and control over Train 32N at all times relevant to this action.

102. Norfolk Southern had a continuing duty to protect Plaintiffs and the Class from the hazardous materials aboard Train 32N at all times relevant to this action.

103. The transportation of the hazardous and flammable materials discussed above is an abnormally and/or ultra-hazardous activity, and Norfolk Southern is thus strictly liable for injuries and damages of Plaintiffs and the Class. Restatement (Second) of Torts §§ 519–20.

104. Because Norfolk Southern engaged in an abnormally dangerous and ultra-hazardous activity, Norfolk Southern is liable for the harm caused to Plaintiffs and the Class, regardless of whether it exercised the utmost care in preventing the harm.

105. As a direct and proximate cause of Norfolk Southern's abnormally dangerous and ultra-hazardous activity, Plaintiffs' properties have been damaged and contaminated with environmental pollution, including, but not limited to, dangerous levels of hazardous and carcinogenic chemicals.

106. As a direct and proximate cause of Norfolk Southern's abnormally dangerous and ultra-hazardous activity, Plaintiffs and the Class suffer, and will continue to suffer, from property damage, diminution of property values, costs of restoring and remediating property, the loss of the quiet use and enjoyment of their properties, and increased risks of negative health effects including cancer.

107. This harm sustained by Plaintiffs and the Class as a result of Norfolk Southern's discharge of hazardous chemicals is the kind of harm that would be reasonably anticipated as a result of the risks involved with transporting hazardous and carcinogenic materials in close proximity to populated areas.

108. Norfolk Southern's operations and resulting toxic discharges were and remain substantial factors in causing harm to Plaintiffs and the Class, and NSC and NSRC are strictly liable, jointly and severally, without regard to fault, for all of the damages suffered by Plaintiffs and the Class that were a direct and proximate result of the derailment, release, and burn of hazardous materials by Norfolk Southern.

109. Norfolk Southern knew that its inadequate policies and procedures for preventing and responding to toxic discharges of hazardous material could easily lead to a sustained disaster and endanger the health and safety of the public.

110. Understanding the risks their conduct posed, Norfolk Southern acted maliciously and recklessly, with aggravated or egregious fraud, and/or with intentional disregard for the rights of Plaintiffs and the Class so as to warrant the imposition of punitive damages.

**<u>COUNT III—PRIVATE NUISANCE</u>**

111. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

112. At all times relevant to this action, Norfolk Southern knew or should have known that the hazardous materials being transported on Train 32N were dangerous to people and

property and that it was substantially certain that improper transportation, handling, and disposal of the materials would harm Plaintiffs and their property.

113. At all times relevant to this action, Norfolk Southern knew or should have known that the toxic materials discharged as a result of the derailment, including, but not limited to, chemicals such as vinyl chloride, benzene, and phosgene were harmful to people and to Plaintiffs' property.

114. At all times relevant to this action, Norfolk Southern knew or should have known that the ignition of hazardous chemicals it was transporting would create conditions dangerous to public health and interfere with the use and enjoyment of private and public property.

115. The derailment and discharge of hazardous chemicals caused by Norfolk Southern has substantially interfered with Plaintiffs' ability to use and enjoy their property. The environmental pollutants have contaminated the water supply, which Plaintiffs have used for drinking, cooking, watering gardens, and providing to pets and livestock. Some residents have had to relocate and/or purchase bottled water. The massive plumes of smoke emitted from the fires have also caused strong odors and chemical residues to cover Plaintiffs' property. The toxic discharges have even caused physical symptoms in some residents and harmed local wildlife and pets.

116. Norfolk Southern's conduct described above constitutes an unreasonable invasion of Plaintiffs' property rights.

117. Norfolk Southern's derailment and discharge of hazardous materials would reasonably annoy and disturb an ordinary person, which is evidenced by the nationwide coverage of the derailment and public outcry.

118. Norfolk Southern's conduct lacks any public benefit and is clearly outweighed by the harms to Plaintiffs and their property. Releasing millions of pounds of hazardous and carcinogenic chemicals directly into the environment and surrounding properties provides no social utility.

119. Plaintiffs and the Class suffer and will continue to suffer from diminished property values, property damage, the inability to use their property as an asset and/or source of collateral for financing, and the inability to use and enjoy their property as they choose. These harms are different from the types of harms suffered by the general public.

120. As a direct and proximate result of Norfolk Southern's conduct described above, Plaintiffs and the Class have suffered and continue to suffer injury and damages, including, but not limited to, property damage, diminution in property value, lost wages, costs to restore and repair property, loss of business income, loss of business goodwill, loss of use and enjoyment of their property, and loss of the ability to use property as an asset and/or source of collateral for financing.

121. Norfolk Southern's conduct described above shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded the rights of Plaintiffs and the Class so as to warrant the imposition of punitive damages.

## **COUNT IV—PUBLIC NUISANCE**

122. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

123. At all times relevant to this action, Norfolk Southern knew or should have known that the hazardous chemicals transported on Train 32N and their byproducts, if ignited, were dangerous to people and property. Harm from improper transportation, handling, and disposal of such hazardous materials was substantially certain.

124. Plaintiffs and the Class have a common right to enjoy their property free from hazardous contamination, to breathe clean air, to have access to running water without dangerously high levels of toxic chemicals, and to live their lives without unreasonable exposure to hazardous and carcinogenic chemicals.

125. Norfolk Southern substantially and unreasonably infringed upon these common rights by negligently, recklessly, and/or intentionally mishandling the transportation and disposal of hazardous and carcinogenic materials.

126. As a direct and proximate result of Norfolk Southern's negligent, reckless, and/or intentional mishandling of the transportation and disposal of hazardous and carcinogenic materials, Plaintiffs' and the public's common right to breathe clean air and have access to running water without dangerous levels of hazardous chemicals was severely diminished or entirely eliminated.

127. As a direct and proximate result of Norfolk Southern's conduct described above, both Plaintiffs and the areas surrounding the derailment site have been contaminated with dangerously high levels of hazardous chemicals, posing a significant danger to public health.

128. As a direct and proximate result of Norfolk Southern's conduct described above, Plaintiffs and the Class have suffered and continue to suffer injury and damages, including, but not limited to, property damage, diminution in property value, lost wages, costs to restore and repair property, loss of business income, loss of business goodwill, loss of use and enjoyment of their property, and loss of the ability to use property as an asset and/or source of collateral for financing.

129. Norfolk Southern's conduct described above shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded the rights of Plaintiffs and the Class so as to warrant the imposition of punitive damages.

## COUNT V—STATUTORY NUISANCE

130. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

131. Pursuant to Section 112 of the federal Clean Air Act, vinyl chloride is a hazardous air pollutant subject to a national emission standard. 41 Fed. Reg. 46560.

132. Ohio Rev. Code § 3704.03 provides that "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

133. The Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6 ("PAPCA"), prohibits the emission of air pollutants of hazardous materials in amounts greater than those set by the federal Clean Air Act. Any violation of PAPCA constitutes a public nuisance, and any person liable for causing such public nuisance "shall be liable for the cost of abatement." 35 P.S. § 4013.

134. Norfolk Southern caused the derailment, the resulting fires, the discharge of hazardous chemicals, and the release and ignition of vinyl chloride into the environment. These actions resulted in the emission of impermissible levels of vinyl chloride into the air, water, soil, and Plaintiffs' property.

135. As a direct and proximate result of Norfolk Southern's conduct described above, Plaintiffs and the Class, along with their property, have been exposed to hazardous air pollutants in violation of Ohio, Pennsylvania, and federal law.

136. As a direct and proximate result of Norfolk Southern's conduct described above, Plaintiffs and the Class have suffered and continue to suffer injury and damages, including, but

not limited to, property damage, diminution in property value, lost wages, costs to restore and repair property, loss of business income, loss of business goodwill, loss of use and enjoyment of their property, and loss of the ability to use property as an asset and/or source of collateral for financing.

137. Norfolk Southern's conduct described above shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded the rights of Plaintiffs and the Class so as to warrant the imposition of punitive damages.

## COUNT VI—TRESPASS

138. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

139. Norfolk Southern knew or should have known that the hazardous materials it transported, released, and ignited were dangerous to people, animals, and real and personal property. It was substantially certain that the emission, discharge, spread, and/or release of these toxic substance would injure Plaintiffs and their property.

140. Norfolk Southern intentionally, knowingly, negligently, carelessly, and/or recklessly caused a trespass to Plaintiffs' properties by:

a. Discharging particulates, pollutants, residue, and hazardous chemicals into the air, water, and soil through the derailment and resulting fires; and

b. Allowing or causing hazardous chemicals to discharge, seep, or migrate underground in such a way that invading Plaintiffs' real property and causing injury to that property was foreseeable.

141. Norfolk Southern disregarded Plaintiffs' rights to their land and property, invaded the real property of Plaintiffs and the Class, and interfered with their possessory interests.

142. Norfolk Southern also authorized, requested, or caused other parties to dispose of waste in such a way that it knew was substantially likely to cause hazardous materials to enter Plaintiffs' properties.

143. Norfolk Southern's conduct resulted in the emission of dangerous levels of hazardous chemicals and massive smoke plumes, causing offensive odors, property damage, and deposits of chemical residue on Plaintiffs' homes, businesses, yards, and farms. Plaintiffs and the Class did not consent to such trespass.

144. Norfolk Southern's trespass has interfered and will continue to interfere with Plaintiffs' rights to use and enjoy their property and will diminish Plaintiffs' property values. The trespass has limited Plaintiffs' ability to avail themselves of the value of their property as an asset and/or source of collateral for financing and to use their property in the manner they choose.

145. Norfolk Southern intentionally, knowingly, and/or negligently caused hazardous chemicals to invade Plaintiffs' properties. Moreover, Norfolk Southern acted maliciously and recklessly, with aggravated or egregious fraud, and/or with intentional disregard for the rights of Plaintiffs and the Class so as to warrant the imposition of punitive damages.

**COUNT VII—WANTON AND WILLFUL MISCONDUCT**

146. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

147. At all times relevant to this action, Norfolk Southern had a duty to Plaintiffs and the Class to refrain from wanton or willful misconduct.

148. Norfolk Southern knew or should have known that the substances it transported were hazardous, carcinogenic, and highly toxic to people, animals, the environment, and property.

149. Norfolk Southern knew or should have known that releasing and/or igniting such materials would result in dangerously high levels of hazardous, carcinogenic, and highly toxic pollutants into the environment and surrounding areas.

150. Norfolk Southern knew or should have known that at least one railcar was malfunctioning and/or was on fire for at least 20 miles before derailment.

151. Despite their knowledge, and contrary to federal and standard industry practices and procedures, Norfolk Southern breached their duties as described in Count I above.

152. Through the conduct described above, Norfolk Southern failed to exercise care towards Plaintiffs and the Class, to whom Norfolk Southern owed a duty of reasonable care.

153. Through the conduct described above, Norfolk Southern demonstrated a deliberate indifference to the health, safety, and well-being of Plaintiffs and the class, despite having knowledge that the probability of harm was great.

154. As a direct and proximate result of Norfolk Southern's conduct described above, Plaintiffs and the Class have suffered and continue to suffer injury and damages, including, but not limited to, property damage, diminution in property value, lost wages, costs to restore and repair property, loss of business income, loss of business goodwill, loss of use and enjoyment of their property, and loss of the ability to use property as an asset and/or source of collateral for financing.

155. Norfolk Southern's conduct described above shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded the rights of Plaintiffs and the Class so as to warrant the imposition of punitive damages.

**COUNT VIII—MEDICAL MONITORING**

156. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

157. As a direct and proximate result of Norfolk Southern's conduct described above, Plaintiffs and the Class have been exposed to hazardous and carcinogenic chemicals and pollutants.

158. Exposure to the hazardous chemicals, including substantial quantities of vinyl chloride which is a known human carcinogen, has increased Plaintiffs' risks of contracting cancer and other latent diseases, and Plaintiffs will require medical monitoring.

159. Monitoring to ensure early diagnosis of cancer and other latent diseases is critical to Plaintiffs and the Class because it will minimize the harm caused by Norfolk Southern's misconduct and enable Plaintiffs and the Class to monitor diseases caused by such misconduct.

160. There are monitoring and testing procedures for cancer and other latent diseases associated with hazardous chemical exposure that make early detection and treatment possible, which helps minimize the harm caused by Norfolk Southern's misconduct.

161. Periodic medical evaluations and diagnostic testing reduces the risk of severe illness by facilitating timely medical intervention, resulting in improved survival odds and better long-term health.

162. As a result, declaratory, injunctive, and/or other equitable relief to enable medical monitoring is appropriate. Plaintiffs make no claim for physical manifestations of bodily injuries resulting from the derailment and subsequent chemical discharges.

163. Plaintiffs request that the Court establish a Court-supervised medical monitoring program funded by Norfolk Southern, with the specifics of that program to be determined by the Court. At a minimum, Plaintiffs request that such program require:

a. That Norfolk Southern notify all Class members exposed to vinyl chloride and other hazardous materials as a result of the derailment that they have, in fact, been exposed and will require medical monitoring;

b. That each Class member have a designated physician for purposes of medical monitoring;

c. That Class members have access to comprehensive diagnostic and treatment options for illnesses caused by exposure to the hazardous chemicals Norfolk Southern discharged into the air, water, and soil;

d. That Norfolk Southern provide information to designated physicians regarding the illnesses and injuries that exposure to vinyl chloride and the other emitted hazardous materials may cause;

e. That medical data be compiled at a group level to enable studies, in addition to the monitoring and treatment of individuals; and

f. That Norfolk Southern bear the burden and cost of addressing administrative problems as they arise.

164. Such a monitoring program is an appropriate use of the Court's equitable powers, as it can be managed by a Court-appointed official and will be used exclusively for mitigating the negative health consequences resulting from Norfolk Southern's conduct.

**COUNT IX: INDUCING PANIC THROUGH DISORDERLY CONDUCT UNDER OHIO REV. CODE §§ 2307.60, 2917.31, AND 2917.11**

165. Plaintiffs incorporate the preceding paragraphs as though fully realleged herein.

166. Pursuant to Ohio Rev. Code § 2917.31(A)(3), "[n]o person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by

doing any of the following:. . . [c]ommitting any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm."

167. Pursuant to Ohio Rev. Code § 2917.11(A)(4), "[h]indering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender."

168. Pursuant to Ohio Rev. Code § 2917.11(A)(5), "[c]reating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful purpose of the offender."

169. Through Norfolk Southern's conduct described above, Norfolk Southern induced panic through disorderly conduct.

170. Norfolk Southern had no lawful or reasonable purpose in derailing the train.

171. Defendants had no lawful or reasonable purpose in releasing and igniting hazardous chemicals into the environment.

172. Under Ohio Rev. Code § 2307.60(A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code."

173. As a direct and proximate result of Norfolk Southern's conduct described above, Plaintiffs and the class have suffered and continue to suffer injury and damages, including, but not limited to, property damage, diminution in property value, lost wages, costs to restore and

repair property, loss of business income, loss of business goodwill, loss of use and enjoyment of their property, and loss of the ability to use property as an asset and/or source of collateral for financing.

174. Norfolk Southern's conduct described above shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded the rights of Plaintiffs and the Class so as to warrant the imposition of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, pray for judgment against Defendants as follows:

A. Certifying this case as a class action, appointing Plaintiffs as representatives of the Class, and appointing undersigned counsel as Class counsel;

B. Awarding all recoverable compensatory, statutory, and other damages, including, but not limited to: (1) loss and diminution of property value; (2) loss of use and enjoyment of property; (3) restoration and repair costs; (3) lost wages; (4) loss of business income; (5) loss of business goodwill; (6) all other relief allowed under applicable laws;

C. Granting declaratory judgment that Defendants are responsible for all past and future costs to remedy the harms caused to Plaintiffs and the Class and their property;

D. Awarding attorneys' fees and expenses as may be allowable under applicable law;

E. Awarding both pre-judgment and post-judgment interest on any amounts awarded;

F. Awarding punitive damages according to proof;

G. Granting injunctive and declaratory relief, as allowed by law; and

H. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 11, 2023

Respectfully submitted,

THE LAW OFFICE OF BRYCE A. LENOX, ESQ. LLC

/s/ Bryce A. Lenox
Bryce A. Lenox (0069936)
3825 Edwards Road, Suite 103
Cincinnati, Ohio 45209
Telephone: (513) 520-9829
bryce@brycelenoxlaw.com

*Local Counsel for Plaintiffs*

SCHLICHTER BOGARD & DENTON, LLP
Andrew D. Schlichter*
Sean Soyars*
Victoria C. St. Jean*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
aschlichter@uselaws.com
ssoyars@uselaws.com
vstjean@uselaws.com
**pro hac vice forthcoming*

*Lead Counsel for Plaintiffs*